## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SCOTTIE MCLEAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-00752-TWP-MPB |
| | ) | |
| WEXFORD OF INDIANA, LLC, | ) | |
| CIEMONE EASTER-ROSE Dr., Psychologist, | ) | |
| DAVID RICHARDSON Dr., Psychologist, | ) | |
| SCOTT LEVINE Dr., Psychologist, and | ) | |
| ROGER PERRY Dr., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' UNOPPOSED MOTION FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF FINAL JUDGMENT

This matter is before the Court on the Motion for Summary Judgment filed by Defendants Wexford of Indiana, LLC ("Wexford"), Roger Perry ("Dr. Perry"), Ciemone Easter-Rose ("Dr. Easter-Rose"), David Richardson ("MHP Richardson"), and Scott Levine ("Dr. Levine") (collectively, "Defendants") (Dkt. 47).  They seek summary judgment on *pro se* Plaintiff Scottie McLean's ("Mr. McLean") constitutional claims against them. Mr. McLean was served with a copy of the Motion, supporting brief, and a notice of his right to respond and submit evidence in opposition to the Defendants' Motion. Mr. McLean has not filed a response and the time for doing so has passed. For the reasons explained below, the Court finds the summary judgment evidence and applicable law demonstrate that the Defendants are entitled to summary judgment, and their Motion, Dkt. 47, is **granted**.

## I.  MR. MCLEAN'S CLAIMS

In Mr. McLean's *pro se* Complaint filed February 19, 2019, he brought several federal constitutional and state law claims against the Defendants.  Upon screening pursuant 28 U.S.C. § 1915A, federal civil conspiracy and supplemental jurisdiction state law contract claims were dismissed.  Allowed to proceed were Mr. McLean's First, Eighth, and Fourteenth Amendment claims against the individual Defendants, all of whom are mental health providers at the Pendleton Correctional Facility ("Pendleton").  A policy or custom claims was allowed to proceed against the corporate defendant, Wexford of Indiana, LLC.  (Dkt. 13.)

Specifically, Mr. McLean alleges that Wexford, by means of its policies or customs, raised his mental health code from a "D" to an "A" without any evaluation or medical treatment and made the change in retaliation for his filing other civil actions.  (Dkt. 2 at ¶ 9.)

He alleges that Dr. Easter-Rose retaliated against him for his prior civil litigation by changing his medical code from a "D" to an "A" without any evaluation or medical treatment, an act that was also deliberately indifferent to his serious medical needs.  *Id.* at ¶ 10.  Additionally, he alleges that Dr. Easter-Rose refused to provide him adequate medical care and discriminated against him, a class-of-one, by treating him differently than other inmates who had also attempted suicide.

Mr. McLean makes identical allegations against Dr. Richardson, Dr. Levine, and Dr. Perry. *Id.* at ¶¶ 11-13.

## II.  SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Federal Rule of Civil Procedure 56(a).  The movant bears the initial responsibility of informing the district court

of the basis of its motion and identifying those portions of designated evidence that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Put another way, on summary judgment the movant must show the court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). If no reasonable trier of fact could return a verdict for the non-movant, summary judgment must be granted. *Celotex*, 477 U.S. at 323.

To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Id.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted). The court views the record in a light most favorable to the non-movant and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Not every factual dispute between the parties will prevent summary judgment, and the non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

As noted, Mr. McLean failed to respond to the Defendants' Motion the deadline for doing so has long passed. The consequence is that Mr. McLean has conceded the Defendants' version of the events. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission."); *see also*, S.D. Ind. Local Rule 56-1 ("A party opposing a summary judgment motion must . . . file and serve a response brief and any evidence . . . that the party relies on to oppose the motion. The response must . . . identif[y] the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment.").

Although *pro se* filings are construed liberally, *pro se* litigants, such as Mr. McLean, are not exempt from procedural rules. *See Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (noting that "*pro se* litigants are not excused from compliance with procedural rules"); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced"). This does not alter the standard for assessing a Rule 56 motion, but it does "reduc[e] the pool" from which the facts and inferences relative to such a motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997).

### III.   FACTS OF THE CASE

The following statement of facts was evaluated pursuant to the standard set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. McLean as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000).

At all times material to the allegations in the complaint, Mr. McLean was incarcerated at the Pendleton Correctional Facility in Pendleton, Indiana.  (Dkt. 2.)  Sometime before entering prison, Mr. McLean had been diagnosed with a "behavior disorder."  (Dkt. 49-17 at 28.)  At his deposition, Mr. McLean testified that he does not know of other inmates at Pendleton who have alleged they were retaliated against after having filed lawsuits.  *Id.* at 154.

Mr. McLean was an inmate kitchen employee at Pendleton from at least 2016 to April 1, 2019, working as a cook, dietician cook, table washer, dishwasher, server, and utility worker.  *Id.* at 39-41.  These jobs gave him ready access to knives.  *Id.* at 45-46.

Dr. Perry is an Indiana licensed psychologist, endorsed as a Health Service Provider in Psychology, which allows him to engage in the independent diagnosis and treatment of mental and behavioral disorders.  (Dkt. 49-1 at ¶ 1.)  He was employed by Wexford at Pendleton from April 1, 2017, until he retired in May 2018.  *Id.* at ¶ 2.  Dr. Perry visited with Mr. McLean in January 2018 and on April 17, 2018.  *Id.* at ¶¶ 6-7.  Mr. McLean did not appear to be in distress and did not present with mental health issues.  Dr. Perry did not observe any serious pathology and noted that Mr. McLean's mental health code was an "A."  *Id.* at ¶ 7.  Dr. Perry noted that Mr. McLean remained an "A" mental health code at the time of this visit.  (Dkt. 49-1 ¶ 7.)[1]

Mr. McLean would see Dr. Perry "all the time on the walk," and would discuss various stressors he experienced.  (Dkt. 49-17 at 52; Dkt. 49-1 at ¶ 8.)  Mr. McLean testified that these informal sessions lasted "anywhere from 15 to 20 minutes, sit there and just rap. . . we just sit

---

[1] The Indiana Department of Correction ("IDOC") uses six mental health codes: A, B, C, D, and F.  (Dkt. 49-13 at ¶ 11).  Inmates who are free from mental illness requiring routine therapy or counseling are classified at "A".  *Id.* at ¶ 11a.  A "D" mental health code indicates that an inmate has a significant mental illness or has attempted suicide while in a correctional facility.  *Id.* at ¶ 11d.  Inmates seen by the mental health staff are continuously evaluated for their mental health needs.  *Id.* at ¶ 15.  Mr. McLean's original assessment was "D" because of a suicide attempt, with his mental health status re-evaluated at each subsequent clinical encounter. *Id.*

there, right by the flag, and we just sit there and talk." (Dkt. 49-17 at 52.) Dr. Perry testified that Mr. McLean never appeared to be in crisis or in significant distress during these informal conversations on the walk. (Dkt. 49-1 at ¶ 8.) As needed, Dr. Perry would redirect Mr. McLean regarding problem-solving techniques.

At one of these informal sessions Mr. McLean told Dr. Perry about his allegations in a prior lawsuit involving Dr. Levine. (Dkt. 49-17 at 127.) As before, Dr. Perry discussed Mr. McLean's concerns and redirected him to productive, problem-solving techniques. *Id.* at 128. Dr. Perry routinely redirected Mr. McLean toward prosocial problem-solving techniques such as filing grievances instead of ruminating on past events. (Dkt. 49-1 at ¶ 9; Dkt. 49-17 at 134, 145-46.)

Mr. McLean testified that during one of the informal sessions, Dr. Perry told him that he would move Mr. McLean up in mental health code, from a "D "to a high status. (Dkt. 49-17 at 158.)

Dr. Perry testifies that he did not "single[] out" Mr. McLean. (Dkt. 49-1 at 4.) Rather, he testifies that he provided Mr. McLean mental health treatment based on his clinical presentation and concerns. *Id.* Mr. McLean never expressed concern about his treatment (other than his continuing complaint about an involuntary injection in 2015) and never appeared to be in mental distress. *Id.* Dr. Perry therefore assessed Mr. McLean as being appropriately rated with a mental health code of "A". *Id.*

Dr. Perry also notes that Mr. McLean's medical records contain the report of Yvonne R. Goodson, a mental health provider, who had seen Mr. McLean on October 19, 2017, and noted that Mr. McLean should have been given a mental health code of "A". *Id.; see also* Dkt. 49-3.

Although Mr. McLean had unresolved diagnoses of Schizoaffective Disorder and Borderline Personality Disorder ("BPD"), Dr. Perry did not observe any clinical indications during

his formal and informal visits with Mr. McLean to indicate that either diagnosis was appropriate (correct). (Dkt. 49-1 at ¶¶ 11-12.) Dr. Perry's primary function during his visits with Mr. McLean was to remind him of proper problem-solving techniques. *Id.* at ¶ 12.

Dr. Easter-Rose did not observe any symptoms indicative of BPD or any other mental health disorder. (Dkt. 49-13 at ¶ 17.)

BPD is characterized by difficulties regulating emotion, with symptoms including depression, unstable interpersonal relationships, unfounded suspicion, being out of touch with reality, fear of abandonment, impulsive behavior, and exaggerated moods. *Id.* at ¶ 16. Typically, patients with BPD are treated with therapy to provide them the ability to regulate their emotions. *Id.*

Dr. Perry also testifies he did not retaliate against Mr. McLean for filing a lawsuit against Dr. Levine. (Dkt. 49-1 at ¶ 13.) Rather, he testifies, he redirected Mr. McLean toward prosocial problem-solving techniques instead of dwelling on perceived threats. *Id.*

Dr. Perry's medical opinion of Mr. McLean's mental health is based on his clinical assessments. *Id.* Dr. Perry considered Mr. McLean's complaints as normal considering his status of incarceration and the relevant stressors that entail such status. *Id.*

David Richardson is a Mental Health Provider ("MHP") licensed in Indiana. (Dkt. 49-7 at ¶ 1.) He recalls seeing Mr. McLean at least once; the medical records indicate two visits at the Pendleton medical unit. (*Id.*; Dkt. 49-17 at 54, 76, 82, and 116; Dkt. 49-11; Dkt. 49-9.) Mr. McLean's first clinical encounter with MHP Richardson took place July 18, 2018. (Dkt. 49-7 at ¶ 5; Dkt. 49-8; Dkt. 49-17 at 66.) At this visit Mr. McLean indicated that he sometimes had "moods," but qualified this by stating that everyone has their moments. (Dkt. 49-7 at ¶ 5; Dkt. 49-9.) MHP Richardson did not witness signs of anxiety, depression, or psychosis during this visit. *Id.*

When MHP Richardson conducts an initial visit with patients, his focus is primarily centered on building rapport, communication, and trust. (Dkt. 49-7 at ¶ 6.) MHP Richardson usually reviews progress notes from the previous three months before meeting with a new patient. *Id.*

Mr. McLean was scheduled to be seen by MHP Richardson on October 10, 2018, but was a "no-show" for the appointment. *Id.* at ¶ 7; Dkt. 49-10.

After Mr. McLean did not appear for the October 10, 2018 appointment, he was rescheduled and seen by MHP Richardson on October 12, 2018. (Dkt. 49-7 at ¶ 8; Dkt. 49-11.) MHP Richardson's medical notes reflect that Mr. McLean arrived at the appointment and began to rant, stating that he did not desire mental health services. *Id.* Mr. McLean's mental health code was an "A" at the time. *Id.*

Mr. McLean alleges that MHP Richardson changed his mental health code to an "A." Dkt. 49-17 at 75, 89. On December 11, 2018, MHP Richardson noted an inconsistency between Mr. McLean's medical records and the IDOC's Offender Information System ("OIS"). (Dkt. 49-7 at ¶ 9.) The medical records reflected the mental health code of "A" but the OIS had not yet been updated with that code. *Id.* Accordingly, MHP Richardson entered a note that Mr. McLean's mental health code remained at "A." (Dkt. 49-7 at ¶ 9; Dkt. 49-12.)

Mr. McLean alleges that MHP Richardson retaliated against him by changing the mental health code following an argument the two had. (Dkt. 49-17 at 83-84.) He also alleges that MHP Richardson did not appear to be familiar with his mental health condition and "just totally didn't give me the same care as he would give everyone else". *Id.* at 60- 61.

During Mr. McLean's first visit with MHP Richardson, he was "irritated" because he was kept waiting in the holding area of the medical unit. *Id.* at 61. At this visit MHP Richardson

"introduced himself, and he said he was . . . taking over for Dr. Perry." *Id.* at 61-62. Mr. McLean became angry when he perceived that MHP Richardson was not familiar with his mental health needs, said "'Fuck you, too,' and walked out." *Id.* at 62. Mr. McLean never discussed his first lawsuit with MHP Richardson. *Id.* at 130.

Dr. Easter-Rose is a psychologist licensed in Indiana. (Dkt. 49-13 at ¶ 1.) Dr. Easter-Rose has been endorsed as a Health Service Provider in Psychology, which allows her to engage in the independent diagnosis and treatment of mental and behavioral disorders. *Id.* Dr. Easter-Rose was a psychologist at Pendleton at all times relevant to this lawsuit. *Id.* at ¶ 2.

Mr. McLean had one informal encounter with Dr. Easter-Rose in February 2019, (Dkt. 49-17 at 107-108, 118), and one clinical encounter on February 12, 2019, (Dkt. 49-13 at ¶ 3; Dkt. 49-16). Dr. Easter-Rose recorded a comprehensive clinical note, which, Mr. McLean noted, "[a]s a matter of fact, she says exactly what I said. It's crazy, she was word for word. . . ." (Dkt. 49-17 at 112; Dkt. 49-14.) The clinical note was to allow follow-up with Mr. McLean following his mental health code change in the OIS. (Dkt. 49-13 at ¶ 4; Dkt. 49-17 at 60, 116-118.) During this visit, Mr. McLean told Dr. Easter-Rose that he had filed a grievance against MHP Richardson due to his belief that his mental health code had changed abruptly, and not because he disagreed with the change. (Dkt. 49-13 at ¶ 5.)

Mr. McLean also told Dr. Easter-Rose that his last self-injury behavior was in 2010 or 2011, but that it did not require extensive medical intervention. *Id.;* Dkt. 49-17 at 157. Dr. Easter-Rose observed that the severity of Mr. McLean's previous self-injuries did not suggest a suicide attempt. *Id.* at 10-19.

Dr. Easter-Rose further noted that Mr. McLean had not been prescribed psychotropic medication in three years. *Id.* She asked about Mr. McLean's then-existing mental health needs,

and Mr. McLean stated that he did not have any at the time.  (Dkt. 49-13 at ¶ 6.)  Mr. McLean stated that he had not been depressed for five years, he did not feel fatigued, did not use illicit substances, he did not have trouble concentrating, and that he had improved his ability to manage anger. *Id.*; Dkt. 49-14.  He also reported that he lived in an open-dorm environment, maintained good social relationships, maintained a job, and was doing well overall.  (Dkt. 49-13 at ¶ 6; Dkt. 49-14.)

During his deposition, when Mr. McLean was shown Dr. Easter-Rose's entry into his medical records, he testified that she "noted everything that took place, she didn't add nothing on, try to – she didn't take no sides."  (Dkt. 49-17 at 121.)  Dr. Easter-Rose told Mr. McLean that his mental health code would remain at "A," then told him that he would be seen in ninety days to formulate a mental health treatment plan.  (Dkt. 49-13 at ¶ 8; Dkt. 49-14. 45.)  Mr. McLean's only complaint about Dr. Easter-Rose's February 12, 2019 meeting with him is that he now contends that she could have placed more emphasis on the need for a mental health plan moving forward. (Dkt. 49-17 at 124.)

Mr. McLean had also made Dr. Easter-Rose generally aware of his allegations against Dr. Levine from the prior lawsuit.  *Id.* at 129.

Dr. Easter-Rose concluded that Mr. McLean demonstrated no signs of functional impairment and no signs of mental illness. (Dkt. 49-13 at ¶ 7.)  Mr. McLean had denied suicidal ideations, homicidal ideations, and self-injurious behavior.  *Id.*

In addition to her notes in the medical record, Dr. Easter-Rose sent an email about the visit with Mr. McLean.  (*Id.* at ¶ 9; Dkt. 49-15.)  In the email Dr. Easter-Rose wrote that Mr. McLean was not opposed to being kept on an "A" mental health code, an assessment that she agreed with. *Id.*

When a mental health provider changes an inmate's mental health code, the change is made in the inmate's medical records and in the IDOC's OIS. (Dkt. 49-13 at ¶ 12.) The OIS is maintained by the IDOC and concerns matters for classification personnel. *Id.* An inmate's medical records, on the other hand, are updated to provide information to other medical personnel who may interact with the inmate and accounts for mental health progress and developments in the inmate's ability to manage their symptoms. *Id.*

Mr. McLean's belief that he was treated differently than other inmate-patients is correct because each inmate receives an individualized assessment. *Id.* at ¶ 18. A number of mental health providers interacted with Mr. McLean and assessed him at an "A" level mental health code. *Id.* But then Mr. McLean was treated the same as other inmates assessed with a mental health code of "A." *Id.*

During his deposition Mr. McLean testified that he believed that his "mental health was put aside because a mental health officer was being attacked by a grievance or lawsuit." (Dkt. 49-17 at 138-42.) The lawsuit for which Mr. McLean believes the Defendants have acted in retaliation is *McLean v. Levine*, Case No. 1:18-cv-00512-TWP-TAB, filed in this Court on February 21, 2018. Mr. McLean sued a number of mental health providers for the forced injection of medication, and in this action continues to take issue with that event. (Dkt. 49-17 at 30-32, 150-51.) In the earlier lawsuit, summary judgment on the merits of the action was granted to all defendants on March 10, 2020. *McLean*, No. 1:18-cv-00512-TWP-TAB, Dkt. 80 (S.D. Ind.).

Mr. McLean's claims in this action against Wexford, are that it is "responsible for whatever chain of command that was broken or wasn't broken, directions, protocol wasn't followed, they're held responsible." (Dkt. 49-17 at 149, 153.) He refers to policy "20104" for his contention that medical personnel were supposed to be more closely monitoring him after the forced injection. *Id.*

11

at 150-151.  Mr. McLean's allegations concerning policies is that "Wexford and them didn't follow the policies."  *Id.* at 152.

Dr. Easter-Rose testifies that Wexford does not maintain a policy of retaliating against patients.  (Dkt. 49-13 at ¶ 13.)  Dr. Easter-Rose is unaware of any retaliation by any mental health staff during her time working at Pendleton.  *Id.*

IDOC custody officials determine an inmate's placement within the IDOC.  Mental health staff cannot direct or control the placement of an inmate at a specific facility or within that facility's particular housing units.  *Id.* at ¶ 14.

Mr. McLean acknowledges that he was assessed as an "A" mental health code until November 2019.  (Dkt. 49-17 at 17-18.)

## IV.  ANALYSIS

As noted earlier, Mr. McLean did not respond to the Defendants' Motion for Summary Judgment.  By failing to respond, he has submitted no evidence to support his claims.  While his verified Complaint could be considered evidence to counter the Defendants' evidence, his December 4, 2019 deposition testimony fails to contradict any of the Defendants' evidence or anything in the undisputed statement of facts.  (*See* Dkt. 49-17.)  Specifically, Mr. McLean failed to identify any policy or custom of Wexford allowing retaliation by its employees or permitting its employees to be deliberately indifferent to his serious medical needs.  *Id.*  In the same vein, Mr. McLean failed to provide evidence that he was retaliated against for his prior lawsuit against Dr. Levine by any of the Defendants, how any of the Defendants' acts or omissions were deliberately indifferent to his serious medical needs, or how he was harmed in any way.  *Id.*

### A.      Wexford of Indiana, LLC

Because Wexford acts under color of state law by contracting to perform a government function, it is treated as a government entity for purposes of § 1983 claims. *See Jackson v. Ill. Medi-Car, Inc*., 300 F.3d 760, 766 n.6 (7th Cir. 2002). To prevail on his custom, policy, or practice claims against Wexford, Mr. McLean needed to show constitutional violations caused by (1) an official policy adopted and promulgated by its officers; (2) a corporate practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658 (1978); *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017) (en banc). "The critical question under Monell . . . is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson*, 849 F.3d at 379. To then show a cognizable deliberate indifference claim against Wexford, Mr. McLean must have evidence to show that he suffered a constitutional deprivation as the result of an express policy or custom of Wexford. As noted above and revealed in the statement of undisputed facts, Mr. McLean has not done so.

Because there is no evidence to support Mr. McLean's claims against Wexford, its motion for summary judgment is **granted**.

**B.**   <u>**Individual Defendants**</u>

Mr. McLean brings the same claims against the four individual defendants, Dr. Easter-Rose, MHP Richardson, Dr. Levine,[2] and Dr. Perry. He contends they retaliated against him for

---

[2] In this action Mr. McLean failed to identify any act or omission by Dr. Levine that was retaliatory or deliberate indifference to his serious medical needs. Because that failure entitles Dr. Levine to summary judgment in this action, the Court need not address whether any claim Mr. McLean may have against Dr. Levine is foreclosed by the judgment in *McLean v. Levine*, No. 1:18-cv-00512-TWP-TAB (S.D. Ind. March 10, 2020), where Dr. Levine's motion for summary judgment against Mr. McLean was granted.

filing the previous lawsuit against Dr. Levine, and in doing so have been deliberately indifferent to his serious medical needs.  (Dkts. 2 and 13 (complaint and screening order, respectively).)

Mr. McLean alleges that the Defendants raised his mental health code from a "D" to an "A" without any evaluation or medical treatment and made the change in retaliation for his filing other civil actions.  (Dkt. 2 at ¶ 9. )  The Defendants' evidence shows otherwise and Mr. McLean has not provided contrary evidence.  Mr. McLean was seen by a number of mental health providers over the relevant time period and his mental health code was always an "A".  During each visit he had with the various providers, including the Defendants, Mr. McLean was assessed for mental health needs and each provider agreed that his mental health code was appropriately set at "A".

"[D]eliberate indifference to a prisoner's serious medical need violates the Eighth Amendment's protection against cruel and unusual punishment."  *Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018).  To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must show: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Knight v. Grossman*, 942 F.3d 336, 340 (7th Cir. 2019).

To prevail on a First Amendment retaliation claim, a plaintiff must show that "(1) []he engaged in activity protected by the First Amendment; (2) []he suffered a deprivation that would likely deter First Amendment activity; and (3) the protected activity []he engaged in was at least a motivating factor for the retaliatory action."  *Archer v. Chisholm*, 870 F.3d 603, 618 (7th Cir. 2017) (internal citations omitted).

First, Mr. McLean has not shown that he suffered from an objectively serious medical condition that posed a substantial risk of harm that the Defendants ignored.  Giving Mr. McLean

14

the benefit of an inference that his mental health status, assessed at mental health code of "A" is a serious medical condition, there is no evidence that the Defendants disregarded the condition.  To the contrary, the Defendants' evidence shows that careful attention was paid to Mr. McLean's mental health needs.  Mr. McLean might have wanted more, or different, mental health treatment, but not receiving his preferred attention is not deliberate indifference.

"To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster,* 439 F.3d 392, 396 (7th Cir. 2006); *see Plummer v. Wexford Health Sources, Inc*., 609 F. App'x 861 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments").  In addition, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).  "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

Regarding the retaliation claim, Mr. McLean has not shown a retaliatory deprivation that would deter First Amendment activity.  Filing a lawsuit is a protected First Amendment activity, but Mr. McLean has not shown the Defendants were deliberately indifferent to his serious medical needs, and his allegations of being re-assessed from a mental health code of "D" to "A" are unfounded and belied by medical records and other evidence.

Because there is no evidence to support Mr. McLean's claims against the individual Defendants, their motion for summary judgment is also **granted**.

## V.  <u>CONCLUSION</u>

For the reasons explained in this Order, Defendants Wexford of Indiana, LLC, Dr. Ceimone Easter-Rose, Dr. David Richardson, Dr. Scott Levine, and Dr. Roger Perry's March 31, 2020 Motion for Summary Judgment, Dkt. [47], is **GRANTED**.  All claims against all Defendants are **DISMISSED** on their merits and this action is **DISMISSED with prejudice**.

Final judgment consistent with this Order and the screening order of April 8, 2019, shall now enter.

**SO ORDERED**.

Date: ____7/13/2020____

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Scottie McLean, #935200
Plainfield Correctional Facility
Inmate Mail/Parcels
727 Moon Road
Plainfield, Indiana  46168

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Jarod Zimmerman
KATZ KORIN CUNNINGHAM, P.C.
jzimmerman@kkclegal.com